Syllabus.

𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

ROSE V. AGEE, ET AL.

November 18, 1920.

1.  BOUNDARIES—*Acreage and Metes and Bounds.*—Where the boundaries called for in a deed were easily ascertainable and were clearly identified and established by the evidence adduced at the trial, a designation of a certain acreage, more or less, must yield to the definite boundaries described in the deed.

2.  EJECTMENT—*Equitable Title.*—A plaintiff who has only an equitable title cannot maintain an action of ejectment.

3.  ESTOPPEL—*Grantee and His Successors Estopped from Denying Prior Deed of Their Grantor.*—Where the predecessor in title of plaintiff in ejectment got the legal title to the land, in question from one A., with a commissioner as a mere conduit of title, plaintiff, holding thus under A., is estopped, by the covenants in A.'s prior deed to defendants' predecessors in title, to deny the title as against the defendants.

4.  ESTOPPEL — *Title by Estoppel — Grantor Subsequently Acquiring Title to Land Conveyed.*—Where a grantor had conveyed to one A., with full covenants of title, a boundary which embraced ninety-seven acres of a 663-acre tract of land to which at the time of the conveyance to A., he had no title, the moment he thereafter acquired the title to the 663-acre tract it inured to the benefit of A., as to the ninety-seven acres; and it matters not whether the grantor got the legal or only the equitable title to the 663 acres.

5.  ESTOPPEL — *Title by Estoppel — Grantor Subsequently Acquiring Title to Land Conveyed.*—Neither a vendor of land nor his subsequent vendees could successfully set up against a prior vendee any beneficial title or claim to the land acquired by the vendor subsequent to the deed to the prior vendee which would result in a breach of the covenants in that deed.

6.  ESTOPPEL — *Title by Estoppel — Grantor Subsequently Acquiring Title to Land Conveyed—Quaere.*—It would seem in Virginia that the title by estoppel arising from after-acquired title binds the land, not only as between the parties, but as to a subsequent purchaser from the grantor, that is, it is binding upon the grantor or his privies.

7. ADVERSE POSSESSION—*Agency—Case at Bar.*—An agent of a corporation was in possession of a tract of land so long as the corporation had anything to do with the land as its agent. After the corporation was placed in the hands of a receiver and ceased to have any connection with the land, the agent took a deed in his own name to a part of the land. From and after that date down to the bringing of an action of ejectment (more than 25 years), the agent and his grantees maintained possession of a part of the land, with claim to the whole, conveyed to him under his deed.

   *Held:* That such agent and his grantees, his co-defendants in the action of ejectment, thereby acquired a complete and indefeasible title to the land, if they did not already have it by virtue of their title papers.

8. EJECTMENT—*Costs—Disclaimer.*—Where land awarded to the plaintiff in the verdict in an action of ejectment was disclaimed by the defendants, and had never at any time been in dispute, plaintiff is not entitled to costs.

Error to a judgment of the Circuit Court of Botetourt county in an action of ejectment. Judgment for defendants. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Haden & Haden,* for the plaintiff in error.

*C. M. Lunsford* and *Wm. R. Allen,* for the defendants in error.

KELLY, P., delivered the opinion of the court.

This is an action of ejectment brought by Matilda Rose against S. C. Agee, Nannie Agee and A. B. Wood. The declaration claimed a boundary of 115 acres. The defendants in their grounds of defense denied the plaintiff's title to ninety-seven acres of that boundary, and entered an informal disclaimer as to the residue. The verdict of the jury was for the plaintiff as to the portion disclaimed and

for the defendants as to the ninety-seven acres, the latter being the only land in actual controversy between the parties, either before or after the action was instituted.

The land in dispute was a part of a larger tract situate on James river, in Botetourt county, containing 873 acres, formerly owned by one George Stull. In February, 1880, Stull conveyed this 873-acre tract to H. C. Douthat, and Douthat a few weeks later conveyed the same to H. C. Parsons for a money consideration, which was partly paid in cash, and for the residue of which he took from Parsons three interest-bearing purchase money bonds, secured by a vendor's lien retained upon the land. These bonds, for some reason not explained in the record and not material here, were assigned by Douthat to Stull. In September, 1880, Parsons conveyed the 873 acres to the Alleghany Coal and Iron Company, and that company assumed the payment of the bonds. In the meantime Stull died, and by his will probated in August, 1880, he gave one-half of all his estate to his sister, Mrs. Sallie Wingo, and the other half to his friend, M. J. Armentrout.

In August, 1883, Armentrout, who owned some land on the opposite side of the river from the Stull tract, entered into a contract with the Alleghany Coal and Iron Company, whereby he sold to that company some timber on his land to be paid for in land from the Stull tract at an agreed rate per acre.

It appears that shortly after the last mentioned contract was made, Armentrout acting for himself and doubtless also for Mrs. Sallie Wingo (from whom he held an omnibus power of attorney), brought a suit, styled *Armentrout* v. *Wood,* seeking to set aside the deed from Stull to Douthat upon grounds which are not disclosed in the record before us. In that suit F. T. Glasgow, administrator of the estate of George Stull, filed an answer and cross-bill, in which he asserted that one of the Parsons purchase money bonds,

amounting to $992, with interest from March 3, 1830 (assigned to Stull and assumed by the Coal and Iron Company) was still unpaid, and he prayed that the 873 acres be sold to satisfy the same. To this cross-bill Armentrout filed an answer in which he set up his contract with the Alleghany Coal and Iron Company, and also stated that if the deed from Stull to Douthat was not set aside, as prayed for in his original bill, he desired to join in the prayer of the cross-bill of Glasgow, administrator, for a sale of the 873-acre tract to satisfy the unpaid purchase money bond. It is to be noted that Armentrout and Mrs. Wingo were the sole distributees and devisees under the will of George Stull, and that Armentrout held a general power of attorney from Mrs. Wingo and her husband to convert into possession all money or property to which she might be entitled from that source.

The foregoing statement leads up to and sufficiently sets forth the pertinent facts as they existed on June 12, 1885, when Armentrout made to S. C. Agee the deed presently to be fully set out, and under which the defendants claim title to the land in dispute. The situation at that date, as set out in more detail above, may be summarized thus: Armentrout had brought a suit to set aside the deed from Stull to Douthat, the result of which, if successful, would have vested in him and Mrs. Wingo the title to the entire 873 acres. In that suit he was also asking the court. if the original object should fail, to award him a sufficient part of the 873 acres to pay for the timber which he had sold to the Coal and Iron Company, and was further uniting with Stull's administrator in the request that the residue of the tract be sold for the satisfaction of the vendor's lien, the net proceeds of which would belong jointly to him and to Mrs. Wingo under the will of George Stull.

With matters standing thus, M. J. Armentrout, in his own right and as attorney in fact for Mr. and Mrs. Wingo,

64

made the above mentioned deed of June 12, 1885, whereby "in consideration of the sum of three hundred dollars cash in hand paid," the receipt of which was thereby acknowledged, he conveyed to S. C. Agee, with covenants of general warranty right to convey against incumbrances, and for further assurances, "that certain tract or parcel of land lying and being all that part of the Geo. Stull tract lying above the iron bridge between James river and the land Samuel D. Wood, commencing at a popular tree near bridge running northwest on mountains to land A. D. Woods, from thence to S. D. Wood's line, near the house of Mrs. Nannie Wood, containing fifty acres more or less."

Nannie Agee and A. B. Wood are the real defendants, and they claim title under this deed from Armentrout to Agee under purchases from the latter. Subsequent to the making of this deed by decree in the chancery cause of *Armentrout* v. *Wood,* Armentrout was assigned and received from a commissioner of the court a deed for 210 acres of the 873-acre tract in payment for the timber sold by him to the Coal and Iron Company; and the remaining 663 acres was in that suit sold to satisfy the purchase money remaining due to the Stull estate. Armentrout became the purchaser, the sale was duly confirmed, and subsequently Benjamin Haden was directed, as a special commissioner, to convey the land to him upon the payment by him to F. T. Glasgow, commissioner, of the sum of $323.70, the balance ascertained to be owing by Armentrout on his purchase after allowing him credit for his interest therein as one of the two distributees of Stull's estate.

Armentrout did not have the money with which to pay the above mentioned balance, and he obtained it from Madison Hook, to whom he was already indebted on other accounts. After this balance was paid to Glasgow, commissioner, Armentrout united with Commissioner Haden in a deed to Madison Hook, which is set out below, and which

speaks for itself. It was not the deed directed by the court, and it does not appear to have been subsequently reported to or acted upon by the court.

The deed was as follows: "Whereas, by a decree entered on the 26th day of October, 1887, by the Circuit Court of Botetourt county, directing the sale of a tract of 663 acres of land lying on James river, in Botetourt county, Virginia, a part of the George Stull tract, this decree being entered in the chancery cause of *M. J. Armentrout* v. *S. D. Wood and others;* and whereas the tract of 663 acres was sold to M. J. Armentrout at the price of $1,600, and the sale thereof was confirmed by decree in the said cause on the 24th day of October, 1890, *it was recited that the entire purchase money was paid,* and Benjamin Haden was directed to convey the said land to M. J. Armentrout with covenants of special warranty; and whereas M. J. Armentrout has become indebted to Madison Hook in the sum of nine hundred and ninety dollars and twenty-five cents ($990.25) with interest thereon from this day until paid; and whereas J. M. Armentrout has directed Benjamin Haden, commissioner, to convey the said land to Madison Hook *to secure the payment of the said sum* of nine hundred and ninety 25/100 dollars, and unites also in this deed as evidence of his directions.

"Now, therefore, this deed, made the 28th day of December, 1891, by and between Benjamin Hade, special commissioner of the Circuit Court of Botetourt county, in the chancery cause of *M. J. Armentrout* v. *S. D. Wood and als.,* appointed by the decree of October 24, 1890, and M. J. Armentrout, parties of the first part, and Madison Hook, of the second part: witnesseth, that for and in consideration of the premises and of one dollar in hand paid, they, the parties of the first part, do grant and convey the said Benjamin Haden, special commissioner aforesaid, with special warranty, and the said M. J. Armentrout with gen-

eral warranty unto Madison Hook, party of the second part, all of that tract of land containing 663 acres, more or less, being a part of the lands of George Stull, dec'd, lying on James river, in the county of Botetourt, and fully described in the survey made in the chancery cause aforesaid, to which reference is here made for a description of the same. But it is expressly understood and agreed that *this conveyance is made only for the purpose of securing to Madison Hook* the payment of the sum of nine hundred and ninety 25/100 dollars with interest, as aforesaid, and when that sum is repaid the said tract of land is to be reconveyed to the said M. J. Armentrout or to whomsoever he may in writing direct." (Italics added.)

Madison Hook died in 1897, leaving a will, whereby he directed that the 663 acres, or enough thereof to pay the sum of $990.25 with interest from the date of his deed from Armentrout and the commissioner, should be sold unless Armentrout paid the sum himself, in which latter event Hook's executor was authorized to reconvey the land to Armentrout, or to such person as he should designate.

The executor named in Hook's will did not qualify, and the estate was committed to F. M. Turner, sheriff of the county, who brought a suit for the construction of the will and for advice and instruction in the administration of the estate. In the course of proceedings in that suit, which as to the 663 acre tract became tantamount to a foreclosure suit, the land was sold to satisfy the indebtedness thereon of Armentrout to Hook, and it was bought by Mrs. Matilda Rose, who in 1917 obtained a deed therefor from a commissioner. It is upon this deed that she relies as plaintiff in the instant case. Armentrout was a party to the last named chancery suit, but neither S. C. Agee nor his co-defendants were impleaded therein.

All parties agree that the deed of June 12, 1885, from Armentrout to Agee, conveyed fifty acres of land which,

after the subsequent assignment to Armentrout of the 210-acre tract, was found to lie within the lines thereof, and that the ninety-seven acres in controversy here lies outside of the 210 acres and within the 663 acres.

The plaintiff claims, first, that the description in the deed of June 12, 1885, embraced only fifty acres; and, second, that even if the deed did cover the additional ninety-seven acres, Armentrout at no time acquired the title thereto.

The defendants on the other hand claim that the deed to Agee purported to convey 147 acres, including the ninety-seven acres here in controversy, and that Armentrout did thereafter get such title to all of it as that under the covenants in his deed to Agee they have a complete defense to the plaintiff's action. They also rely upon their adverse possession.

[1] We have no difficulty in deciding that the description in the deed of June 12, 1885, embraced 147 acres. When that deed was made, the 210-acre tract had not been assigned and its boundaries were unknown, and what Armentrout did was to sell and convey a definite boundary (much of it wild and uncleared) lying wholly within the 873-acre tract. He had no title to any part of it at that time, but was asserting a claim to the whole of it for himself and Mrs. Wingo, and, if that object of the suit failed, he was alternatively asserting an individual claim for a part of the land under his timber contract with the Coal and Iron Company, and asking for the sale of the residue to enforce a vendor's lien, in which he and Mrs. Wingo were jointly interested. The boundaries called for in the deed were easily ascertainable, and they were clearly identified and established by the evidence adduced at the trial. It is familiar law that a designation of acreage must yield to definite boundaries. *Reid* v. *Rhodes*, 106 Va. 701, 707, 56 S. E. 722; *Gravatt* v. *Lane*, 121 Va. 44, 47, 92 S. E. 912.

Nor do we think the plaintiff has shown a superior documentary title to that of the defendants. This question is specifically presented by the plaintiff's assignment of error which challenges the correctness of the following instruction given to the jury over her objection: "The court instructs the jury that the effect of the deed from Haden, commissioner, and M. J. Armentrout to Madison Hook was to put the legal title of the land in Madison Hook as security for the debt of $990.25 mentioned in the deed, and the land remained the land of Armentrout subject to the payment of said debt; and M. J. Armentrout having previously conveyed to S. C. Agee that part of said land which is in controversy in this suit, the jury is instructed that the title of said Agee to the land in controversy was in no wise impaired, encumbered or otherwise affected by said conveyance to Hook; and that the title of the plaintiff having been derived under the said deed to Hook is inferior to that of the defendants, and the plaintiff cannot recover any of the lands conveyed to Agee in the deed from Armentrout of June 12, 1885."

[2-4] There was no error in this instruction of which the plaintiff can complain. There might be some question as to whether the deed from Armentrout and Haden, commissioners, did in fact vest the legal title in Hook, because Armentrout at that time, although the owner of a complete equitable title, had received no deed and did not have the legal title; and it is not altogether clear that the commissioner's deed to a stranger, in the absence of any direction or approval by the court, conferred upon Hook any other title than such as he would have acquired by Armentrout's deed without the commissioner's name to it. We need not decide this question. It is not raised by the defendants, and it could not affect the result. The decisive point is that Hook got Armentrout's title, whatever it was, and he got nothing more; and Mrs. Rose claims solely

under the Hook title. If Hook got only an equitable title, then Mrs. Rose got only an equitable title, and she cannot maintain this action of ejectment. If, on the other hand, as the parties here all concede, and as the court instructed the jury, Hook got the legal title, he got it from Armentrout, with the commissioner as a mere conduit, and Mrs. Rose, holding thus under Armentrout, is estopped by the covenants in Armentrout's deed to Agee to deny the title as against the defendants. Under the view that the legal title passed to Hook, the transaction is essentially the same as if Armentrout had first taken a deed from the commissioner, and had then at once conveyed the land to Hook. Prior to the conveyance to Hook, Armentrout had conveyed to Agee, with full covenants of title, a boundary which embraced ninety-seven acres of the 663-acre tract, and the moment he thereafter acquired the title it inured to the benefit of Agee and his vendees, defendants in this action.

[5] It matters not whether Armentrout got the legal, or only the equitable title to the 663 acres by his purchase at the judicial sale. Certain it is that he got precisely the title which the deed to Hook purported to pass as security for Hook's debt, and which the plaintiff now asserts as the basis of her right to recover in this action. Neither Armentrout nor his vendees could successfully set up as against Agee and his vendees any beneficial title or claim acquired by Armentrout subsequent to the deed to Agee which would result in a breach of the covenants in that deed. 4 Kent Com. 431; *Carver* v. *Jackson* (U. S.), 4 Pet. 86, 7 L. Ed. 791; *Van Rensselaer* v. *Kearney*, 11 How. 297, 13 L. Ed. 703; *Burtners* v. *Keran*, 24 Gratt. (65 Va.) 42; *Reynolds* v. *Cook*, 83 Va. 820, 3 S. E. 710, 5 Am. St. Rep. 317; *Nye* v. *Lovitt*, 92 Va. 710, 717, 24 S. E. 345; *Flanary* v. *Kane*, 102 Va. 547, 566, 46 S. E. 312, 681.

[6] It was said by this court in *Burtners* v. *Keran, supra,* that the estoppel, in cases of deeds by bargain and

sale, "does not operate actually to transfer the estate sub-sequently acquired." And Mr. Raleigh Minor, in his valuable work on Real Property, Vol. 2, sec. 1350, says: "But it is generally admitted that if a conveyance of any kind purports to transfer a good title to certain property, whether this appears from recitals, covenants, or in any other manner, there is in equity at least a personal estoppel upon the grantor thereafter to deny that such estate has actually passed to the grantee, or to claim the land under a subsequently acquired title as against the grantee, in part to avoid circuity of action, and in part on general equitable grounds of good faith and estoppel.

"The distinction between a personal estoppel upon the grantor and an estoppel by which the after acquired title actually passes seems to be important only where the grantor subsequently conveys the after acquired title to a third person. In such case, if the estoppel be merely upon the grantor personally, it would not bind such subsequent purchaser of the after acquired estate—at least, if he be a purchaser for value and without notice of the deed made before the acquisition of the title by the grantor—while if the estoppel operates to pass the after acquired title itself, it is equally as binding upon a purchaser from the grantor, even, it seems, though for value and without notice, as upon the original grantor."

In a note to the same section Mr. Minor adds: "In Virginia it is difficult to ascertain from the decisions just what view is taken of the title by estoppel arising from after acquired title. It would seem that it binds the land, not only as between the parties, but as to a subsequent purchaser from the grantor (after acquiring title), that is, it is binding upon the grantor or his privies. *Reynolds* v. *Cook*, 83 Va. 822, 823, 3 S. E. 710, 5 Am. St. Rep. 317, quoting *Van Rensselaer* v. *Kearney*, 11 How. 297, 13 L. Ed. 703; *French's Lessee* v. *Spencer*, 21 How. 228, 16 L. Ed. 97.

"Another difficult question in Virginia is whether the grantee claiming by estoppel takes a legal or only an equitable title. If the latter equitable principles would apply, and the subsequent purchaser above mentioned, in order to be bound by the grantor's conveyance made before he has acquired full legal title, must have notice thereof; and it would appear that the mere registry of such prior deed would not be notice, under the statute providing that a purchaser shall not be affected by the record of a deed made by his grantor before the date of the deed from which such grantor's title is derived. Va. Code 1904, sec. 2473; post, sec. 1411.

"In *Gregory* v. *Peoples,* 80 Va. 357, the transfer of after acquired title by estoppel is said to arise in equity, but it was held to be a good defense to an action at law in ejectment in *Reynolds* v. *Cook, supra.* See also *Nye* v. *Lovitt,* 92 Va. 710, 24 S. E. 345."

If this interesting and important question is to be regarded as still an open one in Virginia, it need not be decided in this case. It is quite clear from the evidence that Mrs. Rose had actual notice of the prior deed from Armentrout to Agee. The question was not raised by the learned and astute counsel representing the plaintiff here. Their failure to do so may have been due to the fact that they conceded the notice to Mrs. Rose, or to the fact that they regarded the question as concluded by the previous decisions of this court.

The plaintiff undertakes to withhold the case from the operation of the doctrine of estoppel by claiming that Armentrout bought the land with Hook's money, and upon that ground invokes the exception to the doctrine recognized in *Gregory* v. *Peoples,* 80 Va. 355. There is no similarity between the case cited and the case at bar. In the *Peoples Case,* the subsequently acquired title was obtained by money advanced to an agent who acted as such, and not as Armentrout did, for his own benefit.

65

It is insisted with much earnestness that the deed from Armentrout and Haden, commissioner, was not a mortgage but a deed of bargain and sale, and that Armentrout had assigned his bid and purchase to Hook before the deed was made. The evidence fails to sustain this contention. The sale was confirmed to Armentrout, and the evidence as a whole fully corroborates the very positive and unambiguous recitals in the deed showing that it was made merely as a means of securing an ordinary debt from Armentrout to Hook.

The plaintiff also places some reliance upon the fact that Armentrout was a party defendant to the suit in which she purchased the 663-acre tract, but this circumstance is of no avail to her. What she bought in that suit was the Armentrout title which Hook acquired as security for his debt. The benefit of the Armentrout title, as to the ninety-seven acres in dispute, passed by inurement to the defendants, and never became available to Hook for even one moment of time. The defendants were not parties to the suit in question, and if they had been their defense would have been as clear and complete as it is in the present case.

Upon the documentary title, therefore, the instruction of the court was substantially right, and the jury could not have properly found otherwise than as they did.

[7] There is another view of the case, however, in which the judgment complained of would have to be affirmed. In the defendants' grounds of defense it is claimed "that the defendants have had actual, open, notorious and adverse possession of the land under a claim of right for more than fifteen years prior to the institution of this suit, and the plaintiff is barred of her action." The deed was made to Agee in 1885, and he and those claiming under him have had actual adverse possession of a part thereof, claiming to the exterior boundaries of the whole, practi-

cally ever since that date. We do not understand that there is any serious question as to the fact that Agee and those claiming under him have been in possession of a part of the boundary in dispute ever since the deed was made by Armentrout to Agee; but an effort is made to overcome this fact by claiming that Agee at the time of that conveyance was acting as the agent of the Alleghany Coal and Iron Company, and as such was already in possession of the land. The argument is that he began and continued his possession in a fiduciary capacity, and that, therefore, neither he nor his vendees can be permitted to rely upon a hostile claim. There is no substantial foundation for this contention. It does appear that Agee was the agent for the Alleghany Coal and Iron Company, and as such was in a sense in possession of the 873-acre tract so long as that company had anything to do with the land, but it further unmistakably appears that about the year 1885 the company was placed in the hands of a receiver and within a short time thereafter ceased to have connection with the land. There is no possible ground upon which to claim that the Coal and Iron Company had any sort of relationship to the property after the 28th of December, 1891, the date of the deed from the commissioner and Armentrout to Hook. From and after that date down to the bringing of this suit (more than twenty-five years), Agee and his grantees, who are his co-defendants in this ejectment suit, have maintained such a possession of a part of the land, with claim to the whole, as. to have thereby acquired a complete and indefeasible title, if they did not already have it by virtue of their title papers.

It is quite true that this case seems to have gone to the jury upon instructions dealing only with the documentary title, but the oral evidence was largely directed to the question of adverse possession, and that defense was distinctly set up in the written grounds filed in the trial court, and is insistently relied upon in this court.

[8]   The judgment complained of awarded costs against the plaintiff.  This is assigned as error, the contention being that inasmuch as the verdict of the jury was in favor of the plaintiff for a part of the land, she ought to have been awarded the costs of the suit.   There is no merit in this contention.   The land awarded to the plaintiff in the verdict was disclaimed by the defendants, and not only so, but it had never at any time been in dispute, and the case upon this point is, therefore, clearly within the rule as laid down by Judge Burks in *McClung* v. *Folkes,* 122 Va. 48, 53, 94 S. E. 156.

There is no error in the judgment complained of, and it is affirmed.

*Affirmed.*